IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| Sxʷnq̓ʔels l Suẁeĉm / Ksukⱡiⱡmumaⱡ ʾA·k̓aⱡmukwaʾits, Incorporated, d/b/a Energy Keepers, Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>HYPERBLOCK LLC, et al.,<br><br>Defendants. | CV 20–76–M–DWM<br><br><br>OPINION<br>and ORDER |

This suit arises out of an agreement for the sale of electric power to a cryptocurrency operation in Bonner, Montana.  Plaintiff Sxʷnq̓ʔels l Suẁeĉm/Ksukⱡiⱡmumaⱡ ʾA·k̓aⱡmukwaʾits, Inc., d/b/a Energy Keepers, Inc. ("Energy Keepers") contracted with the cryptocurrency company Defendant Project Spokane, LLC for electricity while Defendant Sean Walsh was the sole member of Project Spokane (collectively "Defendants").  With Energy Keepers' consent, Project Spokane assigned the contract to Defendant Hyperblock LLC. Hyperblock LLC stopped paying for electricity in February 2020, and Energy Keepers terminated the contract in May 2020.  Energy Keepers now seeks to pierce the corporate veil to hold Defendants accountable for the default judgment entered against Hyperblock LLC.  Both parties have moved for summary judgment.

1

(Docs. 57, 64.)  Because disputed issues of material fact remain, the motions are denied.

## BACKGROUND[1]

In July 2016, Energy Keepers contracted to sell electricity to Project Spokane under the Master Electric Sales Agreement.  (Doc. 54 at ¶ 50.)  Energy Keepers and Project Spokane memorialized the specific terms of each sales transaction in an order confirmation (the Sales Agreement and Confirmation hereinafter referred to as "the Contracts").  (*Id.* at ¶ 51.)  After its formation in 2017, Walsh was the Chief Executive Officer of another cryptocurrency business, Hyperblock LLC.  (*Id.* at ¶¶ 7, 21.)  In 2017 and 2018, Hyperblock Technologies Corporation—the parent company of Hyperblock LLC—began conducting transactions among its subsidiary companies to amalgamate with Cryptoglobal Corporation, (*id.* at ¶ 33), to become Hyperblock Inc., a publicly traded Canadian corporation, (*id.* at ¶ 9).

As part of this amalgamation effort, in January 2018, Hyberblock LLC entered into an agreement with Defendants to purchase all of Project Spokane's assets ("Project Spokane Agreement").  (*Id.* at ¶ 31.)  After a few amendments, the Spokane Agreement closed on July 10, 2018, (*id.*), but the parties dispute whether a promissory note for CAD $5,000,000 memorializing the Agreement passed from

---

[1] All facts are undisputed unless otherwise indicated.

Hyperblock LLC to Project Spokane on that date, (*see* Doc. 78 at ¶ 8).

Before the Project Spokane Agreement closed, Project Spokane approached

Energy Keepers about assigning the Contracts to Hyperblock LLC, *(id.* at ¶ 11),

and made Energy Keepers aware of the Project Spokane Agreement, (*id.* at ¶ 12).

Subsequently, Walsh sent Energy Keepers an email clarifying "a number of very

important details." (*Id.* at ¶ 13; *see also* Doc. 99 at ¶ 44.) Walsh explained,

1. Hyperblock is basically just a shell that we rolled Project Spokane into in order to go public on the stock exchange up in Toronto. So, Hyperblock is essentially Project Spokane, plus a bunch of additional assets that [Project Spokane] did not have previously.

2. I am the Executive Director of the Board, the CEO, and the largest shareholder by quite a bit, of Hyperblock, and the largest shareholder (though I'll be below 50% fyi).

3. Hyperblock raised about $30 million in its IPO fundraising round. Now Hyper is paying a good chunk of that to the shareholders of Project Spokane for the asset purchase. However, Hyper should still have something like $15 million of working capital as of the IPO date in a couple of weeks.

4. As mentioned above, Hyperblock will be a public company within a couple of weeks (maybe as early as next Friday). This will obviously give it access to enormous sources of capital, which greatly increase the company's creditworthiness vs. a private company like Project Spokane.

(Doc. 78 at ¶ 13; Doc. 99 at ¶ 44.) While the parties agree that Walsh made these

statements to Energy Keepers, they dispute why he did so and the extent to which

Energy Keepers relied on them.

Defendants also argue that Energy Keepers' agreement to the assignment of the Contracts rested exclusively on the recommendation from TEA Solutions, whom Energy Keepers hired to evaluate Hyperblock LLC's creditworthiness. (Doc. 99 at ¶ 46.)  Regardless, the parties agree that, prior to Energy Keepers' consent to the assignment, Hyperblock LLC was required to post a $1 million deposit during the assessment of its creditworthiness.  (Doc. 78 at ¶ 22; Doc. 99 (Def. Supp. SUF) at ¶ 148.)  In July 2018, Energy Keepers consented to Project Spokane's assignment of the Contracts to Hyperblock LLC.  (Doc. 54 at ¶¶ 61, 63 (stating that Energy Keepers executed the assignment in 2020, but context suggests "2020" is a typo).)  Subsequently, Energy Keepers approved two actions suggested by TEA Solutions: adopt a $5 million unsecured credit limit for Hyperblock LLC and return the $1 million deposit that Hyperblock delivered.  *(Id.* at ¶ 68.)

Hyperblock LLC stopped paying for electricity in February 2020.  (*Id.* at ¶ 69.)  In March, Energy Keepers emailed its contacts at Hyperblock LLC, including Walsh, requesting prompt information of any foreseeable "business interruptions."  (Doc. 84 at ¶ 108.)  In April, Walsh resigned from his roles at Hyperblock LLC and Hyperblock, Inc.  (*Id.* at ¶ 113.)  In May, Energy Keepers discontinued service and terminated the Contracts.  (Doc. 54 at ¶ 82.)

Energy Keepers brought this suit, claiming that Hyperblock LLC owed it $3,691,604.12 plus interest.  (*See id.* at ¶¶ 82–84.)  Energy Keepers also claimed

4

that Project Spokane and Walsh were liable as alter egos of Hyperblock LLC. (Doc. 6 at ¶¶ 63–76.)  Default judgment was ultimately entered against Hyperblock LLC in the amount above, plus daily interest.  (Doc. 44.)  On February 23, 2021, the Clerk of Court issued a writ of execution against Hyperblock LLC's Missoula bank account.  (Doc. 108.)  The parties now seek summary judgment on the question of whether an alter-ego theory supports piercing Hyperblock LLC's corporate veil.  (Docs. 57, 64.)

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact."  *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences."  *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (internal quotation marks omitted).  Because the Court is sitting in diversity, Montana's substantive law on corporate veil piercing applies.  *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,* 397 F.3d 1217, 1227 (9th Cir. 2005).

5

ANALYSIS

## I.    Waiver

As a preliminary matter, Defendants claim that Energy Keepers waived all claims against Project Spokane because of the assignment of the Contracts to Hyperblock LLC.  (Doc. 58 at 15.)  Defendants are wrong.  There is no record citation to support their assertion that "[Energy Keepers] relinquished and waived its rights and claims against [Project Spokane] for all claims arising post-Closing Date" through "express declaration in the Assignment."  (Doc. 58 at 16.)  And, in the absence of an express waiver, Defendants must prove waiver through "a course of acts and conduct which induces the belief that the intent and purpose was waiver."  *Edwards v. Cascade Cty.*, 212 P.3d 289, 295 (Mont. 2009).  Energy Keepers sought damages for breach of contract from Hyperblock LLC, and subsequently sought to pierce the corporate veil to hold Project Spokane liable when Hyperblock LLC defaulted.  Those undisputed facts do not indicate that Energy Keepers sat on its claims.  (*See* Doc. 77 at 26 ("[Energy Keepers] had no equitable claim against Spokane at the time of the Assignment, and so could not have relinquished that claim.")).  Thus, Energy Keepers has not waived its claims.

## II.    Summary Judgment

Under Montana law, a court may pierce the corporate veil when a two-prong test is satisfied: the record must show (1) Defendants are the alter ego,

6

instrumentality, or agent of the corporation and (2) the corporate form was used to "defeat public convenience, justify wrong or perpetuate fraud." *Peschel Family Trust v. Colonna*, 75 P.3d 793, 796–97 (Mont. 2003) *abrogated on other grounds by Boyne USA, Inc. v. Lone Moose Meadows, LLC*, 235 P.3d 1269, 1273–74 (Mont. 2010). The parties agree that the focus under the first prong here is "alter ego." But that is where the consensus ends.

As a preliminary matter, the parties disagree both about (1) who is the alter ego of whom and (2) which multi-factor alter ego test applies. Defendants argue that Energy Keepers incorrectly alleges "that Defendants are the alter ego of Hyper[block] LLC instead of alleging that Hyper[block] LLC is the alter ego of Defendants." (Doc. 58 at 20 n.5.) Defendants then apply the six factors identified in *Towe Antique Ford Foundation v. I.R.S.*, 999 F.2d 1387 (9th Cir. 1993), as well as the fourteen-factor test from *Meridian Mineral Company v. Nicor Minerals, Inc.*, 742 P.2d 456 (Mont. 1987), to Project Spokane and conclude that Hyperblock LLC is not the alter ego of Project Spokane. (Doc. 58 at 20–22.) Defendants do not apply any sort of alter ego test to Walsh. (*See id.* at 20 n.5 & 6.) By contrast, Energy Keepers alleges that Walsh is the alter ego of Hyperblock LLC and of Project Spokane. (Doc. 65 at 9; Doc. 77 at 22.) Energy Keepers also argues that Walsh, Project Spokane, and Hyperblock LLC are all the alter egos of each other.

(Doc. 65 at 16.)  In support of their arguments, Energy Keepers focuses on

*Meridian Minerals*.  (Doc. 65 at 14–15.)

Energy Keepers has the better position on both counts.  First, the appropriate

inquiry is whether the individual or other business is the alter ego of the

corporation.  *See Hando v. PPG Indus. Inc.*, 771 P.2d 956, 960 (Mont. 1989)

(explaining when a subsidiary is the alter ego of a corporation); *Peschel*, 75 P.3d at

797 (same for an individual).  Second, *Meridian Minerals* supplies the proper test.

*Towe* is merely a reiteration of the *Meridian Minerals* test and considered alter ego

under a "reverse piercing theory," *see* 999 F.2d at 1390, which is not at issue here.

While *Towe* may provide guidance in the consideration of certain factors, the

*Meridian Minerals* test controls.  Applying it here, summary adjudication of alter

ego is not appropriate.

### A. Alter Ego

An individual or an entity is the "alter ego" of a corporation when "the

corporate affairs of both are so intertwined that, in effect, each no longer has a

separate identity."  *Hando*, 771 P.2d at 960.  "While a parent-subsidiary

relationship may be the classic veil-piercing scenario, it is not an absolute

requirement for alter ego liability in . . . Montana . . .."  *Buckhorn Energy Oaks*

*Disposal Servs. v. Clean Energy Holding Co., LLC*, 2017 WL 1247863, *7 (D.

Mont. Mar. 24, 2017).  In *Meridian Minerals*, the Montana Supreme Court

articulated a non-exhaustive fourteen-factor list for determining whether a

shareholder[2] is the alter ego of a corporation.  742 P.2d at 462.  Those factors are:

1. Whether the shareholder owns all of most of the corporation's stock.
2. Whether the shareholder is the director and/or president of the corporation.
3. Whether the shareholder makes all corporate decisions without consulting the other directors or officers.
4. Whether the shareholder, officers, and/or directors fail to comply with the statutory requirements regarding operation of the corporation.
5. Whether the shareholder's personal funds are commingled with the corporation's funds.
6. Whether the shareholder's personal credit and corporation's credit are used interchangeably to obtain personal and corporate loans.
7. Whether the shareholder's personal business records are not kept separate from corporation's business records.
8. Whether the shareholder and corporation engage in the same type of business.
9. Whether the shareholder and corporation have the same address which is the address of shareholder's personal residence.
10. Whether the shareholder admits to third parties that the shareholder and the corporation are one and the same.
11. Whether the corporation's profits and earnings are distributed through means other than dividends.
12. Whether the corporation is undercapitalized.
13. Whether the parent and subsidiary have the same name.
14. Whether the parent and subsidiary have the same directors and officers.

*Id.*  The relevant factors are addressed in turn.

---

[2] Because courts apply these factors to both individuals and entities, *see, e.g.*, *Buckhorn Energy*, 2017 WL 1247863, at \*7 (applying factors to question of whether a business was an alter ego of a corporation), "shareholder" is read to encompass both individuals and businesses.

### 1.  Alter ego: Walsh as to Project Spokane[3]

Evaluating whether Walsh was the alter ego of Project Spokane does not implicate every *Meridian Minerals* factor.  While the record tends to favor Energy Keepers, disputed issues of material fact remain.

### a.  Factors favoring Energy Keepers

Factors 1, 2, and 8 are undisputed and favor Energy Keepers.  On factor 1, the parties agree that Walsh has always been the majority stock owner of Project Spokane and the sole member since 2019.  (*See* Doc. 54 at ¶ 18.)  Relevant to factor 2, the parties also agree that Walsh was in a leadership role at Project Spokane, and that he was the manager and sole member of PS Mgmt, LLC, which is the manager of Project Spokane.  (*Id.* at ¶ 19.)  A defendant's position as the president or director of a corporation may weigh in favor of a finding that the defendant was the alter ego of the corporation.  *See Berlin v. Boedecker*, 887 P.2d 1180, 1188 (Mont. 1994).  On factor 8, the parties stipulated to Walsh's past employment in the cryptocurrency field.  (Doc. 54 at ¶ 22.)

### b.  Factor favoring Defendants

Though neither party addresses factor 9, it is undisputed that Project

---

[3] Defendants did not consider the question of corporate veil piercing vis-à-vis Walsh and Project Spokane in their motion for summary judgment.  Their arguments are therefore limited to their response in opposition to Energy Keepers' motion for partial summary judgment and facts are construed in their favor.

Spokane's address is listed in Greenwood Village, CO.  (Doc. 66-3 at 2.)  Walsh's

address is in Puerto Rico.  (Doc. 59-17 at 2.)  This factor weighs against a finding

that Walsh was Project Spokane's alter ego.

### c.  Factors in dispute

Despite the parties' arguments to the contrary, the remaining factors—

factors 3, 5, and 7—are disputed.  Factors 10 and 12 also seem relevant but are not

addressed by the parties.

On factor 3, the parties dispute whether Walsh was an independent

decisionmaker for Project Spokane.  *Cf. E.C.A. Env't Mgmt. Servs. Inc. v. Toenyes*,

679 P.2d 213, 218 (Mont. 1984) (finding that lack of corporate meetings or, at the

very least, lack of documentation of meetings weighed in favor of finding of alter

ego).  Walsh could not remember if Project Spokane ever held any member

meetings, (Doc. 65 at 19 (citing Doc. 66-1 (Walsh Depo.) at 20)), and Energy

Keepers argues that he did not produce any documentation of members approving

any major decisions, (Doc. 67 at ¶ 7).  Defendants disagree and argue that the

examples Energy Keepers cite occurred while Project Spokane was manager-

managed by PS Mgmt, LLC.  (Doc. 83 at 9–10.)  This factor is further complicated

by the fact that neither party fully explains what the manager-managed structure

means for the Court's analysis.

Factor 5, whether Walsh commingled his funds with Project Spokane, is also disputed. Energy Keepers identifies three instances in which Walsh allegedly commingled his funds with those of Project Spokane: in 2016, (Doc. 65 at 21 (citing Doc. 66-1 (Walsh Depo.) at 78)); in 2017, (*id.* (citing Doc. 66-1 (Walsh Depo.) at 84–85; Doc. 67 at ¶ 7)); and in 2018, (Doc. 66-12 at 2; *see also* Doc. 67 at ¶ 7). Defendants agree that Walsh loaned Project Spokane money in 2016 but argue it was properly documented. (Doc. 83 at 15.) As to the alleged 2017 loan, Defendants argue that Energy Keepers offered no evidence that it happened. (*Id.*) For the 2018 loan, Defendants point to the June 2018 balance sheet for Project Spokane as showing that the loan was satisfied when the Project Spokane Agreement closed. (*Id.* at 16.)

Given these outstanding disputes and the murkiness of the record, it is unclear who this factor favors. The document Defendants cite regarding the 2016 loan does not appear to reflect the $2.9 million loan. Defendants are also correct that there is no evidence that Project Spokane actually received the alleged 2017 loan, and Energy Keepers is silent on that argument in their reply. (Doc. 97 at 4–6.) Defendants seem to admit that Walsh made the 2018 loan to Project Spokane, but they argue it was paid off. (*See* Doc. 83 at 16.) The question of whether it was paid off is not the inquiry under *Meridian Minerals*, but even assuming Walsh made this loan, it is not enough to tip this factor in Energy Keepers' favor.

Similarly, factor 7, which considers whether Walsh commingled his records with Project Spokane's, is disputed.  Energy Keepers argues that Walsh commingled his records because he never had a Project Spokane email address and instead used his personal email for Project Spokane business.  (Doc. 65 at 19; Doc. 66-1 (Walsh Depo.) at 92–93.)  In response, Defendants concede that Walsh used his personal email for matters related to Project Spokane but argue that the "business record exception" to the hearsay rule prevents the Court from considering Walsh's use of his personal email.  (Doc. 83 at 12.)  Defendants also argue—though they characterize this argument as relevant to factor 8, rather than factor 7—that Walsh did not mingle his records and personal business with that of Project Spokane because Walsh did not create jobs for or employ members of his family, unlike the defendant in *Towe*.  (*Id.* at 13 (citing *Towe*, 999 F.2d at 1392).)

Though there is a fair inference that Walsh's use of a single personal email gave him access to any materials related to Project Spokane that were sent to that email, at this stage in the proceedings, "all reasonable inferences" must be construed in favor of Defendants since they oppose summary judgment on this question.  *See Lenz*, 815 F.3d at 1150.  Defendants' hearsay arguments about the email, however, are irrelevant.  Additionally, Defendants are correct that there is no evidence Walsh employed family members, but that fact is not dispositive.

Finally, neither party addresses factors 10 nor 12, but they seem relevant. As to factor 10, Walsh's use of his personal email address for Project Spokane's business suggests that he held himself out to third parties as an individual doing the business of Project Spokane.  As far as factor 12 goes, Energy Keepers references it in a heading, but does not substantively discuss it.  (*See* Doc. 65 at 20.) Defendants do not address it at all.  But this factor seems particularly important because undercapitalization can also demonstrate bad faith on the second prong of the veil-piercing test, which is enough to justify piercing the corporate veil.  *See Peschel*, 75 P.3d at 797.

### 2.  Alter ego: Hyperblock LLC and Walsh/Project Spokane

The second alter ego question is whether Walsh and Project Spokane were the alter egos of Hyperblock LLC.  Once again, while more *Meridian Minerals* factors favor Energy Keepers, disputed issues of material fact remain.

### a.  Factors favoring Energy Keepers

Factors 2, 6, 8, and 10 favor Energy Keepers.  On factor 2, the parties stipulated that Walsh was the CEO and manager of Hyperblock LLC until April of 2020.  (Doc. 54 at ¶ 21.)  Walsh was also the CEO of Hyperblock Inc. upon its formation, and in 2019 he served as Hyperblock Inc.'s Chairman and Interim CFO. (*Id.* at ¶ 34; Doc. 66-21 at 2.)  Though Defendants dispute that Walsh's position at Hyperblock Inc. is relevant to the veil piercing question here, *Hando* makes clear

that the Court can consider Walsh's role in Hyperblock Inc. because of its parent-subsidiary relationship to Hyperblock LLC. *See* 771 P.2d at 960. Since the Defendants do not dispute that Walsh had a leadership role in Hyperblock Inc., this factor weighs in favor of Energy Keepers.

On factor 6, despite Defendants' claims that TEA Solutions recommended that Energy Keepers find Hyperblock LLC creditworthy and Energy Keepers relied on that recommendation rather than on any representations from Walsh about Hyperblock LLC's finances, this factor favors of Energy Keepers. The parties do not dispute that TEA Solutions received financial statements from Project Spokane in addition to statements from Hyperblock LLC during its credit inquiry. (*See* Doc. 99 at ¶ 154; *see also* Doc. 97 at 11.) This factor indicates Walsh attempted to leverage Project Spokane's finances to secure credit for Hyperblock LLC.

Factor 8 also favors Energy Keepers. Energy Keepers is correct that Hyperblock LLC and Project Spokane were engaged in the same business: "[Hyperblock LLC] continued [Project] Spokane's business at the Bonner datacenter." (Doc. 65 at 30; *see* Doc. 66-1 (Walsh Depo.) at 29–30.) Additionally, Hyperblock LLC was in the cryptomining industry, which is the same industry that Walsh has worked in for at least the last seven years. (Doc. 54 at ¶ 22.)

Finally, Walsh assured Energy Keepers during the negotiations for the assignment of the Contracts that he would "remain in control" of Hyperblock LLC

and that "HyperBlock is essentially Project Spokane." (Doc. 66 at ¶ 44.) Such statements support a finding of alter ego under factor 10. *See Berlin*, 887 P.2d at 1187 (holding that defendant's statements that "I am [the company]" supported a finding of alter ego.) The parties also do not dispute that Walsh stated that Hyperblock was essentially a "shell" for Project Spokane. (Doc. 66 at ¶ 44.) The parties dispute the degree to which Energy Keepers relied on that representation, but reliance is more accurately considered under the second veil-piercing prong.

### b. Factors favoring Defendants

Factor 9 favors Defendants. It is undisputed that Walsh, Project Spokane, and Hyperblock LLC never shared an address.

### c. Disputed factors

Factors 1, 3, 4, 5, and 12 are relevant and disputed. On factor 1, the parties dispute whether the Court can consider Walsh's shareholder status in Hyperblock Inc., Hyperblock LLC's parent company. However, as a threshold matter, there is a dispute over whether Walsh "owned more than 12% of [Hyperblock Inc.]." (*See* Doc. 99 at ¶ 104; Doc. 83 at 16.) Because it is unclear if Walsh owned the most stock in Hyperblock Inc., it is unclear whether the rule from *Hando* that "courts may extend the obligations and resulting liabilities of a subsidiary corporation to a parent or grandparent corporation" applies. 771 P.2d at 960. Thus, the disputed facts here prevent this factor from weighing in favor of either party.

As to factor 3, whether Walsh or Project Spokane acted as independent decisionmakers for Hyperblock LLC is not addressed, but seems important given that Energy Keepers argues that it relied on Walsh's statement that "Walsh held [Hyperblock LLC] out to [Energy Keepers] as a 'shell' that he rolled [Project] Spokane into" when it agreed to the assignment of the Contracts.  (Doc. 65 at 17.) Such a statement implies that Walsh acted as an independent decisionmaker for both Project Spokane and Hyperblock LLC, but neither party discusses factor 3.

Factor 4 is disputed.  Energy Keepers alleges that this factor favors piercing Hyperblock LLC's corporate veil because Hyperblock Inc., ostensibly under the direction of Walsh, failed to comply with the statutory requirements of a publicly traded company.  (Doc. 65 at 24.)   Defendants respond that activity related to Hyperblock Inc. is irrelevant because the veil-piercing inquiry can only be directed at Walsh and/or Project Spokane, though this position is at odds with Defendants' position in their motion for summary judgment that Energy Keepers cannot state a claim against Walsh or Project Spokane.  (*Compare* Doc. 83 at 16–17 *with* Doc. 58 at 20 n.5.)  Defendants also maintain that it is disputed whether Hyperblock Inc. failed to comply with statutory requirements and it is disputed "whether there is a causal connection between Walsh's conduct and [Hyperblock Inc.'s] delay in filing its 2018 audited financial statements."  (Doc. 83 at 17.)

17

This factor requires greater factual development.  Because neither party addresses the third factor—the degree of control that Walsh or Project Spokane exercised over either Hyperblock LLC or Hyperblock Inc.—it is impossible to determine whether Hyperblock Inc.'s alleged failure to file its returns according to statutory requirements can be attributed to Walsh and in turn attributed to Hyperblock LLC.  Additionally, while Energy Keepers is correct that there is no "causal link" requirement in Montana law, (*see* Doc. 97 at 8), there is a requirement that the evidence considered on summary judgment be relevant.  Since there are no facts to establish that Walsh had control over Hyperblock Inc.'s failure to comply with statutory obligations, there is insufficient evidence to make Hypberblock Inc.'s alleged filing failures relevant to the present dispute.

Factor 5 is disputed as well.  According to Energy Keepers, Walsh made numerous, undocumented loans to Hyperblock entities.  (Doc. 65 at 25.)  Loans that are not documented between shareholders or subsidiaries—either by a promissory note or security agreement—support a finding of alter ego.  *See Peschel*, 75 P.3d at 795, 798.  In response, Defendants rely on the statements from Thomas Copley, Energy Keepers' proposed expert, that Copley found no evidence of commingling of Walsh's funds and the funds of Hyperblock LLC.  (Doc. 83 at 18 (citing Doc. 84-10 (Copley Depo.) at 17–21).  Neither party addresses how or whether this factor applies to Project Spokane, and there are material disputes

18

regarding the facts underlying each parties' claim on this factor. This factor does not favor either party at this juncture.

Finally, factor 12 is disputed. The parties agree that Hyperblock LLC was ultimately undercapitalized so that it could not pay its debts. (*See* Doc. 65 at 32; *cf.* Doc. 83 at 28 (admitting that Hyperblock LLC could not pay its obligations but arguing it was not responsible for that failure).) But the parties dispute the relevant timeframe for considering undercapitalization. Defendants argue that the proper period is the closing date for the Project Spokane Agreement (July 10, 2018). (Doc. 83 at 27.) In support of this argument, Defendants cite *E.C.A. Environmental Management Services*, 679 P.2d 213 (Mont. 1984). But *E.C.A.* is not a slam-dunk for Defendants. Defendants are correct that, unlike the suspect corporation in *E.C.A.*, there is no evidence to show that Hyperblock LLC was undercapitalized at the time it entered into the assignment of the Contracts when the Project Spokane Agreement closed; however, the Court in *E.C.A.* also relied on the fact that the suspect corporation continued to be undercapitalized in its consideration of whether the corporation was an alter ego. *Id.* at 219.

Energy Keepers, by contrast, argues that Hyperblock LLC was undercapitalized if Hyperblock LLC's capital was insufficient to pay "debts that may reasonably be expected to arise in the normal course of business." (Doc. 97 at 14 (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 677 (9th Cir. 2017).)

19

Although straightforward, the *Perfect 10* guidance is of questionable value here because the *Perfect 10* Court was interpreting California's alter ego test, which differs from Montana's. *Perfect 10* held that a corporation's inability to pay reasonably foreseeable business costs may amount to bad faith. 847 F.3d at 677. Thus, if the *Perfect 10* rule applies, it seems more appropriate to apply it to the second prong of the veil piercing test, not to the undercapitalization factor in the alter ego analysis.

Finally, Energy Keepers and the Defendants dispute why Hyperblock was undercapitalized. Energy Keepers argues that the evidence shows that Walsh's actions undercapitalized Hyperblock LLC, (Doc. 65 at 32), while Defendants argue that Hyperblock LLC was undercapitalized because of a drop in the global bitcoin market, (Doc. 83 at 28; *see also* Doc. 58 at 7 & n.2). This dispute of fact is material, but the parties miss the context. These facts will be most relevant to the second prong of the veil piercing test, which considers bad faith.

### 3. Conclusion

Because disputed issues of fact remain on both alter ego inquiries, summary judgment is not appropriate.

### B. Abuse of the corporate form

The second prong of the two-part veil piercing test is whether the corporate entity was used "as a subterfuge to defeat public convenience, justify wrong or

perpetuate fraud." *Peschel*, 75 P.3d at 797 (internal quotation marks omitted). Given the two separate veil piercing requests, there are two separate abuse of the corporate form inquiries here: (1) whether Walsh abused the corporate form of Project Spokane, and (2) whether Walsh and Project Spokane abused the corporate form of Hyperblock LLC.  Though the Court need not reach this issue based on the disputed facts discussed above, both inquiries are briefly addressed below.

Neither Energy Keepers nor Defendants consider whether Walsh abused the corporate form of Project Spokane.  This is puzzling given Energy Keepers' request that the Court to find Walsh was the alter ego of Project Spokane because both prongs of the veil piercing test must be met.  *See Peschel*, 75 P.3d at 796–97.

Energy Keepers states three grounds for finding abuse of the corporate form of Hyperblock LLC: (1) Hyperblock LLC acted in bad faith by using electricity when it could not pay for it; (2) Walsh used his inside positions at Hyperblock LLC and Hyperblock, Inc. to protect his own interests; and (3) Walsh's self-dealings with Hyperblock LLC and Hyperblock Inc. ensured that Hyperblock Inc. would not be able to satisfy the judgment against Hyperblock LLC.  The resolution of all three will depend, at least in part, on the Court's alter ego determination.

For example, the Court cannot resolve Energy Keepers' argument that Hyperblock LLC's consumption of unpaid-for energy was inequitable and constitutes bad faith under Mont. Code Ann. § 28–1–211 because Defendants did

not owe a duty under § 28–1–211 if they were not parties to the contract. However, if they are found to be the alter ego of Hyperblock LLC then they may be liable for Hyperblock LLC's alleged bad faith.  Similarly, even if Walsh's actions are comparable to those of Mr. White, an individual who abused the corporate form in *Drilcon, Inc. v. Roil Energy Corp.*, *Inc.*, 749 P.2d 1058, 1064 (Mont. 1988), these actions are only of consequence if Walsh is found to be the alter ego of Hyperblock LLC.  Lastly, though it was legal for Project Spokane to foreclose on its interests, this foreclosure is suspect when considered in the totality of the circumstances and could support piercing the corporate veil if Project Spokane is found to be the alter ego of Hyperblock LLC.  Summary judgment is therefore inappropriate on the second prong of the veil-piercing test as well.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that both parties' motions for summary judgment (Doc. 57, 64) are DENIED.

DATED this 26th day of February, 2021.

Donald W. Molloy, District Judge
United States District Court